UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
VISTA FOOD EXCHANGE, INC.,

                              Plaintiff,           **MEMORANDUM OF DECISION
AND ORDER**
03-CV-5203 (DRH) (WDW)

          - against -

VISTAR CORPORATION,

                           Defendant.
-----------------------------------------------------------X
**A P P E A R A N C E S :**

Attorneys for Plaintiff:
**FRANK M GRAZIADEI, P.C.**
130 Water Street
New York, New York 10005

Attorneys for Defendant**:**
**RUSKIN MOSCOU FALTISCHEK, P.C.**
East Tower
190 EAB Plaza
Uniondale, New York 11556-0190
By: Mark S. Mulholland, Esq.
    Kimberly B. Mandel, Esq.

**STEVE ROSENBLATT**
317 W. Redman Avenue
Haddonfield, New Jersey 08033


**HURLEY, District Judge:**

               Plaintiff Vista Food Exchange, Inc. ("Plaintiff") filed the present action against

defendant Vistar Corporation ("Defendant"), claiming that Defendant's logo infringes upon

Plaintiff's trademark.  Defendant has moved for summary judgment pursuant to Federal Rule of

Civil Procedure 56.  For the reasons that follow, Defendant's motion is granted and this case is

dismissed in its entirety.

***BACKGROUND***

The material facts, drawn from the Complaint and the parties' Local 56.1

Statements, are undisputed unless otherwise noted.  This case involves a dispute between the

parties over their respective trademarks, which are reproduced below.



Plaintiff has been in the business of wholesale food distribution since 1979.  Plaintiff buys

perishable meats and seafood from suppliers and resells these commodities to distributors who in

turn sell to restaurants and supermarkets. Plaintiff registered its mark with the United States

Patent and Trademark Office on June 13, 2000.

Defendant's business is twofold: one half of Defendant's business involves

selling single-serve portions to wholesalers who in turn sell to vendors who fill vending

machines with these products; the other half involves the sale of food and non-food items

directly to chain restaurants, Mexican restaurants, and pizza parlors.  Defendant's business is a

spin-off of its predecessor, Multifoods Distribution Group ("Multifoods"), which included an

entity called Vending Supply of America or "VSA."  (Dep. of Patrick M. Mulhern ("Mulhern"),

dated May 19, 2004, at 6-7.)  After the spin-off, new management was obligated to drop the

Multifoods name.  Defendant sought to include "VSA" in its new mark to continue the goodwill

2

acquired from trading for 30 years under the VSA name.  (*Id.* at 7.)  When asked how he came

up with "VISTAR," Mulhern, Defendant's Executive Vice President, responded: "[W]e threw

everything we could think of with a V and an A and an S, and, together, that made logical sense.

It was either a word or an invented word that we felt like we would be able to carry through the

business, and we turned it over to our legal people.  The legal people researched it and ended up

with Vistar."  (*Id.*)  Mulhern further testified that the "legal people" were aware of Plaintiff's

existence, (*id.*), and that "Vista" was a name his company had wanted to use but ultimately

abandoned, (*id.* at 12).

       Defendant commissioned an exhaustive search for the mark "VISTAR" prior to

adopting its "VISTAR/VSA" mark.  After reviewing the report, Defendant's counsel contacted

Plaintiff's counsel to obtain consent to register the mark "VISTAR."  Defendant's counsel faxed

several "mock-ups of how the mark might be used," all variations of the term "VISTAR."  (Aff.

of Steve Rosenblatt, dated Aug. 5, 2004, ¶ 8 and Ex. 1.)  Plaintiff's counsel responded that

Plaintiff would not consent to any of the designs "since they threaten to impair [its] valuable

trademark rights."  (Aff. of Frank M. Graziadel, dated Sept. 15, 2004, Ex. C.)  Plaintiff's counsel

further indicated  "[s]ince you stated that these are only proposed marks that have not yet been

used, and that in the absence of the requested consent your client Multifoods Distribution Group

would adopt an alternative mark, we trust that will happen."  (*Id.*)

       Thereafter, Defendant adopted the mark "VISTAR/VSA" as displayed above,

which was not one of the design versions previously sent to Plaintiff's counsel.  The mark was

registered with the United States Patent and Trademark Office on May 11, 2004.

**DISCUSSION**

**I.      Applicable Law and Legal Standards**

     **A.      Summary Judgment**

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the

allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits

supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir.

1996) (internal citations omitted).

       The district court considering a summary judgment motion must also be "mindful

of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928

(5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the

respective parties will bear at trial guide district courts in their determination of summary

judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988).  Where the

non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's

burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an

essential element of the non-movant's claim. *Id.* at 210-11.  Where a movant without the

underlying burden of proof offers evidence that the non-movant has failed to establish her claim,

the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not

'implausible.' "  *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

    **B.**    ***Trademark Infringement***

       To prevail on a claim of trademark infringement, Plaintiff must show that

Defendant "(1) without permission, copied, reproduced, or imitated the plaintiff's (2) registered

trademark in commerce (3) as part of the sale or distribution of goods or services (4) and that

such use is likely to cause confusion between the two marks." *Streetwise Maps, Inc. v. Vandam,*

*Inc.,* 159 F.3d 739, 742 (2d Cir. 1998) (citing 15 U.S.C. § 1114(1)(a)); *see also Gruner + Jahr*

*USA Publ'g v. Meredith Corp.,* 991 F.2d 1072, 1075 (2d Cir. 1993).  Because the parties do not

dispute the first three factors, the central issue before the Court is whether Defendant's use of the VISTAR/VSA trademark is likely to cause confusion.  *See Streetwise Maps, Inc.,* 159 F.3d at 743 (citing *Arrow Fastener Co., Inc. v. Stanley Works,* 59 F.3d 384, 390-91 (2d Cir.1995)).

"To support a finding of infringement, a *probability* of confusion, not a mere possibility, must exist."  *Id.* (emphasis added); *see also Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 161 (2d Cir. 2004).  A probability of confusion "may be found when a large number of purchasers likely will be confused as to the source of the goods in question." *Streetwise Maps, Inc.,* 159 F.3d at 743.

In determining whether or not there is a likelihood of confusion, courts in the Second Circuit apply the eight factors set forth by Judge Friendly in *Polaroid Corp. v. Polaroid Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961):

> (1) the strength of plaintiff's mark; (2) the similarity of the parties'
> marks; (3) the proximity of the parties' products in the
> marketplace; (4) the likelihood that the plaintiff will "bridge the
> gap" between the products; (5) actual consumer confusion between
> the two marks; (6) the defendant's intent in adopting its mark; (7)
> the quality of the defendant's product; and (8) the sophistication of
> the relevant consumer group.

*Playtex Prods., Inc.*, 390 F.3d at 162 (quoting *Polaroid*)).

"Where the predicate facts are beyond dispute, the proper balancing of these factors is considered a question of law."  *Id.* (citing *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000)).  In general, no single factor should be treated as dispositive.  *Id.* Furthermore, the evaluation of the *Polaroid* factors is not "a mechanical process by which the party with the greatest number of factors wins."  *Id.*  "Instead, the court 'should focus on the ultimate question of whether consumers are likely to be confused.'"  *Id.* (quoting *Nabisco, Inc.*,

220 F.3d at 46).

Finally, the Court notes that the fact that the United States Patent and Trademark Office accepted Defendant's mark for registration creates a presumption that the mark is valid. *See Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 114 (2d Cir. 2001) (citing 15 U.S.C. § 1057(b)).[1]

## II.   Application to the Present Case

Plaintiff presents two arguments why Defendant's motion should be denied. First, Plaintiff argues that its expert report raises a question of fact as to the ultimate issue of whether there is a likelihood of confusion between the two parties' trademarks.  Second, Plaintiff submits that questions of fact preclude the Court from determining some of the *Polaroid* factors. Plaintiff's arguments will be addressed in turn.

### A.   Plaintiff's Expert Report

#### 1.   The Survey

Plaintiff submits a report by its expert, James T. Berger ("Berger"), wherein he discusses a survey he conducted "to determine whether there is a likelihood of public confusion between the trademarks and trade names 'Vista' and 'Vistar.'" (Report of James T. Berger, dated Sept. 1, 2004, at 1 ("Berger Report").)  Based on his survey, Berger concludes that "there is a significant likelihood of confusion in the marketplace between the Vista and the Vistar names." (*Id.* at 10.)  Plaintiff argues that "[w]hile [it] does not contend that Mr. Berger's report is

---

[1]  15 U.S.C. § 1057(b) provides in pertinent part that "[a] certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark . . . ."

dispositive on the issue of likelihood of confusion for purposes of the ultimate determination of this litigation, plaintiff does contend that the Report of James T. Berger does, at the very least, raise an issue of material fact as to whether there is a likelihood of confusion between the trademarks of the parties."  (Pl.'s Opp'n Mem. at 3.)

In July 2004, Berger surveyed 75 "people who fall within target market characteristics of [Plaintiff] . . . in the Milwaukee, WI, suburb of Brookfield, WI."  (Berger Report at 4.)  "The Milwaukee market was selected because neither Vista nor Vistar distributes products in this market and would therefore be unknown to any research participant."  (*Id.* at 4-5.)  Each participant was shown an eight-page brochure entitled "We Have a World to Exchange" which had Plaintiff's logo "prominently displayed on the front and back covers."  (*Id.* at 7.)  "Inside the brochure five headlines contained the word Vista and [in] all there 43 separate mentions of Vista within the five pages of text."  (*Id.*)  "After reading the brochure, each participant was asked a series of marketing-oriented questions" so that Plaintiff could gather information about the Milwaukee market which Plaintiff claims to be contemplating entering. (*Id.* at 7-8.)

At the conclusion of the survey, Berger states that "half of the participants were asked" the following question: "When you first sat down, I asked you to read a brochure.  Which of these companies, if any, produced that brochure."[2]  (*Id.* at 8.)  The participant was then "shown a list of ten different wholesalers o[f] meats, poultry, and/or seafood."  (*Id.*)  The names of the companies were "Prime Access, Fresh Market, Allen Brothers, Vistar, Con Agra, Vons,

---

[2]  The Court presumes that Berger's reference to questioning "*half* of the participants" (emphasis added) at the conclusion of the survey is in error because when Berger later sets forth the results of this question, it is clear that all 75 people responded.

Dole & Baily, Kings Food, Foodcomm International and Armour." (*Id.*)  "The names were displayed in 36 point black Times Roman type on a white sheet of paper enclosed within a clear plastic laminate." (*Id.*)

Thirty-nine participants (52%) selected Vistar, twenty-nine participants (38.7%) chose "NONE or NONE OF THEM," and seven participants (9.3%) choose another company on the list. (*Id.* at 8-9.)  Based on the fact that "52 percent of the respondents believe that the source of the Vista brochure was 'Vistar,'" Berger concludes that there is significant likelihood of confusion in the marketplace between the two names. (*Id.* at 10.)

### 2.       Applicable Law and Legal Standards

"In addition to offering direct evidence of actual confusion by customers, retailers, salesmen, or the like, what has become a usual way to demonstrate . . . consumer confusion . . ., in a case where the existence of . . . consumer confusion is not otherwise obvious, is for the proponent to undertake some form of survey of consumer attitudes *under actual market conditions*." *Mattel, Inc. v. Azrak-Hamway Int'l, Inc.*, 724 F.2d 357, 361 (2d Cir. 1983) (emphasis added).  "While a survey may indicate the existence of a question of fact on the likelihood of confusion, [t]he survey must . . . have been fairly prepared and its results directed to the relevant issues." *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984) (internal quotation marks and citations omitted).  In determining the evidentiary value of a survey, courts examine the following factors:

> (1) the "universe" was properly defined, (2) a representative
> sample of that universe was selected, (3) the questions to be asked
> of interviewees were framed in a clear, precise and non-leading
> manner, (4) sound interview procedures were followed by
> competent interviewers who had no knowledge of the litigation or
> the purpose for which the survey was conducted, (5) the data

9

> gathered was accurately reported, (6) the data was analyzed in
> accordance with accepted statistical principles and (7) objectivity
> of the entire process was assured.

*Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F. Supp. 1189, 1205 (E.D.N.Y. 1983); *see also Malletier v. Dooney & Bourke, Inc.*, 340 F. Supp. 2d 415 (S.D.N.Y. 2004) (applying some of these factors); *Jaret Int'l, Inc. v. Promotion in Motion, Inc.*, 826 F. Supp. 69, 73 (E.D.N.Y. 1993) (applying *Toys "R" Us* factors).  While errors in survey methodology usually go to weight of the evidence, a survey should be excluded under Federal Rule of Evidence 403 when its probative value is substantially outweighed by the risk of prejudice or confusion.  *See Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218, 228 (2d Cir. 1999); *see also Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2d Cir. 1999).

Here, there are several defects in the survey which significantly reduce its probative value.   As an initial matter, the brochure shown to the participants did not replicate "actual market conditions."  *Mattel, Inc.*, 724 F.2d at 361.  The brochure correctly showed Plaintiff's logo only twice, once on the front cover and once on the back cover.  Inside the brochure, however, were 45 mentions of the name "Vista" only, absent the words "Food Exchange Inc." and Plaintiff's flag logo.  After removing the brochure and asking general questions, the participants were provided with a list of ten names in 36 point black Times Roman font, including "VISTAR."  Defendant's mark was not shown as it is used in commerce.  Rather, it was displayed without the stylized capital V, the proper font, the proper color (green letters with a yellow star above a stylized V), and the "VSA."  Thus, by focusing on the words "Vista" and "Vistar" alone, the survey failed to replicate actual marketing conditions and improperly skewed results in favor of responses indicating confusion.  *See American Footwear Corp. v.*

10

*General Footwear Co. Ltd.*, 609 F.2d 655, 660 (2d Cir. 1979) (approving lower court's finding

that survey was defective "for failure to conduct it under actual marketing conditions" and citing

lower court's reasoning: "'it seems to me that using the advertisement in the form that the

defendant finds objectionable . . . would get a more accurate response as to whether or not there

is the likelihood of confusion with the defendant's product than leaving it off.'"); *WE Media,*

*Inc. v. General Elec. Co.*, 218 F. Supp.2d 463, 474 (S.D.N.Y. 2002) ("[The survey] did not use

pictures or advertisements that approximate what a potential customer would encounter in

making her television-viewing choices. Thus, by presenting respondents with word lists, [the

survey] essentially measured respondents' word associations devoid of context."), *aff'd*, 94 Fed.

Appx. 29 (2d Cir. 2004); *Jaret*, 826 F. Supp. at 74 ("Since there is no dispute that either SOUR

PATCH KIDS or SOUR JACKS purchasers would ever purchase these products without the full

marks on the boxes, the survey technique of removing portions of them is suspect."); *see also*

*Brennan's Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 133 (2d Cir. 2004) ("When

evaluating the similarity of marks, courts consider the overall impression created by a mark.

Each mark must be compared against the other as a whole; juxtaposing fragments of each mark

does not aid in deciding whether the compared marks are confusingly similar.") (citing *Universal*

*City Studios*, 746 F.2d at 117).

   This flaw is further exacerbated by the survey's failure to use a control product,

i.e., "'a non-infringing product which is similar to the products at issue.'" *Nabisco v. Warner-*

*Lambert Co.*, 32 F. Supp. 2d 690, 700 (S.D.N.Y. 1999) (quoting *ConAgra, Inc. v. Geo A. Hormel*

*& Co.*, 784 F. Supp. 700, 728 (D. Neb. 1992), *aff'd*, 990 F.2d 368 (8th Cir. 1993)), *aff'd*, 220

F.3d 43 (2d Cir. 2000).  None of the other names on the list with Vistar even remotely resemble

"Vistar" or "Vista" and therefore the survey improperly guides participants to chose "Vistar" in response to the last question. *See id.* (rejecting survey results which did not use controls).

Moreover, the survey utilized an improper universe. "[O]ne of the most important factors in assessing the validity of an opinion poll is the adequacy of the 'survey universe,' that is, the persons interviewed must adequately represent the opinions which are relevant to the litigation." *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980) (quoting *American Basketball Ass'n v. AMF Voit, Inc.*, 358 F. Supp. 981, 986 (S.D.N.Y.), *aff'd*, 487 F.2d 1393 (2d Cir. 1973)). The courts have held that to be probative on the issue of actual confusion, a survey must rely on responses of *prospective* purchasers of the products in question. *See Universal City Studios*, 746 F.2d at 118 (finding survey defective where it "it utilized an improper universe in that it was conducted among individuals who had already purchased or leased [Defendant's] machines rather than those who were contemplating a purchase or lease"); *Weight Watchers Int'l, Inc. v. Stouffer Corp.,* 744 F. Supp. 1259, 1273 (S.D.N.Y. 1990) (reasoning that those who do not contemplate a purchase may be less aware of relevant source-indicating distinctions). Because in most trademark infringement cases the senior user and the junior user sell competing products, the courts have rarely needed to address the question of which market should be tested for actual confusion. In *Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733, 741 (2d Cir.1994), the Second Circuit concluded that the proper universe depends on the type of confusion at issue. Where the senior user is concerned about the "traditional" type of confusion (*i.e.,* that the junior user is selling its products as if they come from the senior user), the relevant market consists of the junior user's customers. *Id.*; *see also Jaret*, 826 F. Supp. at 73 ("*Toys "R" Us* factor two requires that the 'appropriate universe . . .

12

include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods
. . . .'") (quoting *Amstar*, 615 F.2d at 264).  In contrast, when the issue is whether consumers

mistakenly believe that the senior user's products actually originate from the junior user

("reverse" confusion), the appropriate universe consists of the senior user's customers.  *See id.*

Here, the Complaint alleges that Defendant's logo causes "confusion among and

mislead[s] the users of plaintiff's food distribution services into believing that defendant's

products were, in fact, the plaintiff's or were in some way connected therewith."  (Compl. ¶ 27.)

Thus, Plaintiff is claiming the "traditional" type of confusion.  The right universe, therefore, is

the junior user's (Defendant's) potential customers.  The Berger Report, however, indicates that

the universe was defined as 75 persons "who fall within target market characteristics of

[Plaintiff] . . . in the Milwaukee, WI suburb of Brookfield WI."  Milwaukee was chosen because

neither party distributes products in that market.  No effort was made to include individuals who

fall within Defendant's target market and as is discussed *infra*, the parties serve different tiers in

the food distribution chain.  Thus, the survey's reliance on Plaintiff's market as opposed to that

of  Defendant's further weakens its results.

Even had the universe been properly defined, 75 is too small a sample to be

representative of the universe of potential consumers of Defendant's products, which are

distributed nationwide.  *See Bonechi v. Irving Weisdorf & Co., Ltd.*, No. 95 Civ. 4008, 1995 WL

731633, at *8 (S.D.N.Y. Dec. 8, 1995) (finding sample of 69 participants too small to adequately

represent universe of potential consumers of New York City souvenir books); *Exxon Corp. v.

XOIL Energy Res., Inc.,* 552 F. Supp. 1008, 1021 (S.D.N.Y. 1981) (finding sample of 194

interviewees not representative of universe defined as Americans likely to be active investors in

13

securities; "194 persons . . . will [not] support projection over a broad geographical base, or conclusions predicated thereon"). This flaw further reduces the survey's weight. *See U.S. Info. Sys., Inc. v. International Bhd. of Elec. Workers Local Union Number 3, AFL-CIO*, 313 F. Supp. 2d 213, 232 (S.D.N.Y. 2004) (finding that small sample size goes to weight rather than to reliability and admissibility of study).

In sum, the Court finds that the survey conducted by Berger is flawed to the point that its probative value is substantially outweighed by the survey's potential for unfair prejudice and confusion. *See Schering*, 189 F.3d at 228 (survey subject to "Rule 403's more general prohibition against evidence that is less probative than prejudicial or confusing"); *Starter Corp.*, 170 F.3d at 297 (finding that "district court did not abuse its discretion [in excluding survey] because it found the probative value of the survey so slight that it was easily outweighed, under a Rule 403 analysis, by the danger of confusion of the issues"); *see also Universal City Studios*, 746 F.2d at 118 (finding survey "so badly flawed that it cannot be used to demonstrate the existence of a question of fact on the likelihood of consumer confusion"); *Revlon Consumer Prods Corp. v. Jennifer Leather Broadway, Inc.*, 858 F. Supp. 1268, 1276 (S.D.N.Y. 1994) (finding survey "so unreliable that it is entitled to no weight"), *aff'd* 57 F.3d 1062 (2d Cir. 1995); *Exxon Corp.*, 552 F. Supp. at 1021 (affording survey no weight where survey not "taken under market conditions" and "not conducted on a properly selected and representative sample of the population"). Because it is axiomatic that inadmissible information cannot defeat a well-grounded motion for summary judgment, Plaintiff's reliance on the Berger survey is misplaced. Moreover, even assuming arguendo that the survey was admissible, its weight would be de minimus and, thus, insufficient to raise a triable issue of fact on the likelihood of consumer

14

confusion.

**B.      The Polaroid Factors**

Plaintiff also argues that there are genuine issues of material fact as to several of the *Polaroid* factors.  The Court will address each factor in turn.

**1.      The Strength of the Mark**

The strength of a mark refers to its distinctiveness, i.e., its tendency to identify goods sold under the mark as emanating from one particular source.  *See Streetwise Maps*, 159 F.3d at 743; *Brennan's, Inc.*, 360 F.3d at 130.  To determine a mark's strength, courts consider two factors: its inherent distinctiveness and its distinctiveness in the marketplace.  *See Streetwise Maps*, 159 F.3d at 743; *Brennan's, Inc.*, 360 F.3d at 130-31.

"[I]nherent distinctiveness[] examines a mark's theoretical potential to identify plaintiff's goods or services without regard to whether it has actually done so."  *Id.* at 131.  Courts classify a mark in one of four categories in ascending order of inherent distinctiveness: generic, descriptive, suggestive, and arbitrary.[3]  *See Streetwise Maps*, 159 F.3d at 744;

_____

[3]  The different categories of inherent distinctiveness have been described as follows:

> A generic term refers . . . to the genus of which the particular product is a species, e.g., "Encyclopedia," and is not entitled to trademark registration or legal protection. A descriptive mark is one which conveys an immediate idea of the ingredients, qualities or characteristics of the goods, e.g., "World Book" for an encyclopedia.  A suggestive mark is one that require[s] imagination, thought and perception to reach a conclusion as to the nature of the goods, e.g., Coppertone for suntan oil.  An arbitrary or fanciful mark is one that has no association with the particular product or service, e.g., "Kodak" for photographic equipment.

*Windsor, Inc. v. Intravco Travel Ctrs., Inc.*, 799 F. Supp 1513, 1522 (S.D.N.Y. 1992) (internal quotation marks and citations omitted).

*Brennan's, Inc.*, 360 F.3d at 131.  The parties here agree that Plaintiff's mark is suggestive and therefore falls into the second highest ranking category of distinctiveness.

A mark is suggestive when it suggests the features of the product but requires the purchaser to use his or her imagination to figure out the nature of the product.  *Streetwise Maps*, 159 F.3d at 744; *see also Horn's, Inc. v. Sanofi Beaute, Inc.*, 963 F. Supp. 318, 321 (S.D.N.Y. 1997) ("Since a mental leap is required to arrive at the meaning Horn attaches to [its trademark], the mark is suggestive.").  The Court agrees with the parties' classification and proceeds to consider Plaintiff's mark's distinctiveness in the marketplace.  *See id.* ("Suggestiveness, however, does not necessarily determine the issue regarding the strength of the mark.  We must still consider the mark's distinctiveness in the marketplace.").

Distinctiveness in the marketplace "looks solely to that recognition plaintiff's mark has earned in the marketplace as a designator of plaintiff's goods or services."  *Brennan's Inc.*, 360 F.3d at 131.  Plaintiff's mark is "Vista Food Exchange Inc."  Plaintiff's registration certificate states that "no claim is made to the exclusive right to use 'Food Exchange Inc.', apart from the mark" in its entirety.  (Compl. Ex. A.)

The Court finds that "Vista" is not particularly distinctive in the marketplace as many other companies use the word "Vista" in their names.  In this regard, Defendant has produced evidence that there are 10 businesses in the Bronx and 67 businesses in Manhattan operating under or incorporating the name "Vista."[4]  Moreover, Defendant has submitted proof that there are at least thirteen federally registered marks using the term "Vista" in the food

_____

[4]  Seventy-five percent of Plaintiff's inventory is stored in New York City.

business.  Plaintiff does not dispute Defendant's findings but merely asserts that the companies using the term "Vista" in the Bronx and Manhattan are not in the food distribution business. Extensive third-party use of the term "Vista," however, still serves to weaken Plaintiff's mark despite the different nature of the other companies.  *See Streetwise Maps*, 159 F.3d at 744 (finding mark weakened by extensive use of the words "street" and "wise" in names registered by manufacturers of other products).

Plaintiff, on the other hand, does not present any evidence that the public has come to identify "Vista" with its company.  Rather, it relies on *W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567 (2d Cir. 1993), *superceded on other grounds*, *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39 (2d Cir. 1994), where the Second Circuit noted that low sales indicate a "low national recognition of" a company's product.  *Id.* at 573.  From that, Plaintiff cites its sales of approximately $110 million in 2003 for the proposition that high sales necessarily evidences a high national recognition.  The Second Circuit's dicta that low sales demonstrates low recognition, however, does not necessarily imply that the converse is true.  In any event, in the absence of any evidence that Plaintiff's mark is distinctive in the marketplace, and in the face of Defendant's evidence that the term "Vista" is commonly used in the marketplace, the Court finds that although Plaintiff's mark is ranked as suggestive for its inherent distinctiveness, it is not strong.  Accordingly, this factor favors Defendant.

### 2. *The Similarity of the two Marks*

"In determining whether the two marks are similar, and therefore likely to provoke confusion among prospective purchasers, courts appraise 'the overall impression created by the logos and the context in which they are found and consider the totality of factors

that could cause confusion among prospective purchasers.'"  *Streetwise Maps*, 159 F.2d at 744

(quoting *Gruner + Jahr*, 991 F.2d at 1078).  "Each mark must be compared against the other as a

whole."  *Brennan's Inc.*, 360 F.3d at 133; *see also I.T.S. Industria Tessuti Speciali v. Aerfab

Corp.*, 280 F. Supp. 581, 588 (S.D.N.Y. 1967) ("It is well settled that marks cannot be dissected

for purposes of comparison but must be considered in their entirety.").  Moreover, "[t]he fact that

the two marks appear similar is not dispositive.  Rather, the question is whether such similarity is

more likely than not to cause consumer confusion."  *Id.*

      Defendant correctly notes the differences in the parties' marks as follows:

> The marks use completely different fonts, as Plaintiff's mark
> appears mostly in lowercase letters whereas Defendant's mark
> appears in all capital letters.  Plaintiff's mark has multiple words,
> which appear on multiple lines of text, whereas Defendant's mark
> is a unitary expression that appears on a single line. Plaintiff's
> mark has a[n] American flag-like logo to the left-end of the word
> VISTA, while Defendant's mark has a single star over one leg of
> the "V" in the term VISTAR and no flag-like logo.  Plaintiff's
> mark has larger letters on the top line and smaller letters below,
> while Defendant's mark, apart from the stylized first letter "V" in
> the term "Vistar," contains all letters of the same size. . . . Further,
> as can be seen by comparing the uses of the marks on the parties'
> delivery trucks and related items, . . . Plaintiff's mark is presented
> in a variety of color combinations while Defendant's mark features
> green letters with a yellow star over the right leg of the "V" in the
> term "VISTAR."
>
>       Plaintiff's trucks are elaborately painted, which according
> to its president, Vincent Pacifico, has been the subject of much
> attention from consumers and the general public. . . . Mr. Pacifico
> testified that consumers notice Plaintiff's use of color, the flag logo
> and the letter font in the presentation of Plaintiff's mark. . . . By
> contrast, Defendant's trucks, which display the VISTAR/VSA
> mark and the stylized V on a primarily white background, appear
> sedate.
>
>       There is also a vast difference between the connotations of
> the marks.  Plaintiff's mark is a real word that can be found in the

> English dictionary. . . . Defendant's mark as a whole is a fanciful, made-up term and therefore is completely distinguishable from Plaintiff's mark.

(Def.'s Mem. at 8-9.)  The Court finds that these undeniable differences compel the conclusion that these marks are not confusingly similar.  As the Second Circuit noted in *Streetwise Maps*, "[w]hile the two names sound similar, the trademarks themselves are not confusingly similar, given the context in which a purchaser sees them."  *Id.* at 744; *see also* *Brennan's Inc.*, 360 F.3d at 133 (finding that plaintiff-restaurant "Brennan's" was not confusingly similar to defendant restaurant "Terrance Brennan's Seafood & Chop House"); *Streetwise Maps*, 159 F.3d at 744 (finding "Streetwise" not confusingly similar to "Steetsmart"; "Several key distinctions may be observed between the products themselves and the overall impression created by the marks that would lead consumers to believe the products originated from different companies."); Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 396 (2d Cir. 1995) (concluding that defendant's use of a six-digit model number that contained the symbol "T50" was not confusingly similar to plaintiff's use of the mark "Model T-50"); *W.W.W. Pharm.*, 984 F.2d at 573 (finding the marks "Sportstick" and "Right Guard Sport Stick" distinct because of the second user's addition of the company name and different mode of presentation); *Haven Capital Mgmt., Inc. v. Havens Advisors, L.L.C.*, 965 F. Supp. 528, 531 (S.D.N.Y. 1997) ("[E]ven though the words 'haven' and 'havens' are different only as to one letter, there is little likelihood of confusion in the use of these names or marks."), *aff'd*, 159 F.3d 1346 (2d Cir. 1998).  Thus, this factor strongly favors Defendant.

### 3.   *The Proximity of the Parties' Products in the Marketplace*

This factor focuses on whether the two products compete with each other.  *See*

*Streetwise Maps*, 159 F.2d at 745.  As recently articulated by the Second Circuit:

> The competitive proximity factor has two elements, market proximity and geographic proximity. Market proximity asks whether the two products are in related areas of commerce and geographic proximity looks to the geographic separation of the products. Both elements seek to determine whether the two products have an overlapping client base that creates a potential for confusion.

*Brennan's*, 360 F.3d at 134.

### a.    *Market Proximity*

"To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion."  *Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 582 (2d Cir. 1991).  Here, Plaintiff buys perishable meats and seafood from suppliers and resells these commodities to distributors who in turn sell to restaurants and supermarkets.  In 2003, Plaintiff had about $110 million in gross sales, of which less than $250,000 was for goods sold directly from Plaintiff to restaurants.  (Dep. of Vincent Pacifico, dated May 19, 2004 ("Pacifico Dep."), at 26-27.)  Defendant's business is comprised of two parts: one half of Defendant's business involves selling single-serve portions to wholesalers who in turn sell to people who fill vending machines with these products; the other half involves the sale of food and non-food items directly to chain restaurants, Mexican restaurants, and pizza parlors.  Less than 8% of Defendant's business involves pork, poultry, and beef and less than 2% involves seafood.  (Mulhern Dep. at 15-16.)  In 2003, Defendant had sales of $2.45 billion.  One percent of Defendant's business involves sales to other food distributors.  (Dep. of Patrick M. Mulhern, dated May 19, 2004, at 26-27.)

Plaintiff argues that the parties' businesses are proximate because "both parties

deal in food distribution." (Pl.'s Opp'n Mem. at 7.)  In that regard, Pacifico testified "just because I'm in another level in the food chain doesn't mean that I'm not a food service distributor." (Pacifico Dep. at 94.)  The Court disagrees.  "In assessing product proximity we look at 'the nature of the products themselves and the structure of the relevant market.'" *Brennan's*, 360 F.3d at 134 (quoting *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 967 (2d Cir. 1981)).  Here, although the parties are both in the food business, their services are quite different from one another.  With the exception of a very small percentage of its business, Plaintiff sells meat and seafood to *distributors who in turn* sell to restaurants and supermarkets.  Half of Defendant's business involves selling single-serve portions to wholesalers who in turn sell to people who fill vending machines with these products.  This portion of Defendant's business clearly has no overlap with Plaintiff's.  The other half of defendant's business involves the sale of products, less than 8% of which is comprised of meat and less than 2% seafood, directly to restaurants.  Thus, Plaintiff is a supplier to distributors while Defendant is a distributer for restaurants.  Therefore, not only is the bulk of the parties' product base different but the parties market their goods to different classes of customers through different "channels of trade." *See Windsor,* 799 F. Supp. at 1523; *see also W.W.W. Pharmaceutical*, 984 F.2d at 573.  Because the parties' businesses do not "serve the same purpose," *see Lang*, 984 F.2d at 582, they cannot be said to be in "market proximity."

The parties' lack of market proximity is further demonstrated by the fact that they currently share only one common customer.  Plaintiff provided Defendant with a complete customer list that was compared against Defendant's "Top 50 Customer List" as well as a spreadsheet of additional customers of Defendant.  Only three customers of Plaintiff's

overlapped by name with those customers on Defendant's additional customer list and none overlapped Defendant's "Top 50 Customer List."  In accordance with the parties' Protective Order, these customers will hereinafter be referred to as "Customer X," "Customer Y," and "Customer Z."  Defendant services a different location of Customer X from those serviced by Plaintiff and Defendant's sale to Customer Y was a one-time sale in order to liquidate inventory for a business that was taken over by Customer Y.  As a result, the parties continue to have only one overlapping customer, Customer Z.

Plaintiff first started doing business with Customer Z in 2003 and conducted about $543,000 in sales over a two-year period.  In a 12-month period including part of 2003, Defendant made approximately $173,000 in sales to Customer Z, most of which was candy. Customer Z competes with Defendant in the metropolitan Houston area, and it is common in the food services industry for competing food service companies to make occasional spot purchases from each other to alleviate a temporary product shortage.  Thus, to the extent the proximity analysis seeks to "determine whether the two products have an overlapping client base that creates a potential for confusion," here, the parties businesses are not proximate. *Brennan's*, 360 F.3d at 134.

### b.   *Geographic Proximity*

The present record reveals that geographically, Plaintiff has sales offices in nine states east of the Mississippi and approximately 20-30% of its business is conducted west of Mississippi.  Defendant does business nationwide.  Without more information, the Court finds that this portion of the proximity analysis favors Plaintiff as both parties appear to operate on a national scope.  However given that the parties operate on different tiers in the food business,

22

deal for the most part with different products, and have only one common customer, the Court

finds that the products are not proximate and thus this factor fails to give rise to a question of

fact regarding the likelihood of consumer confusion.

### 4.       The Likelihood that Plaintiff will "Bridge the Gap"

The question under this factor is the likelihood that Plaintiff will enter

Defendant's market.  *W.W.W. Pharmaceutical*, 984 F.2d at 574.  "This factor is designed to

protect the senior user's 'interest in being able to enter a related field at some future time. . . ."

*Id.* (quoting *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1172 (2d Cir. 1976)).

Plaintiff does not argue that it intends to "bridge the gap" with respect to the non-food items

offered by Defendant.  Instead, Plaintiff contends that "[a]s the plaintiff [Pacifico] testified[,]

plaintiff does look from time to time for opportunities throughout the country to supply its

perishable food products to other and new customers."  (Pl.'s Opp'n Mem. at 8.)  Plaintiff's

speculation of possible future customer overlap is insufficient to raise a question of fact on this

issue.

### 5.       Actual Consumer Confusion Between the Two Marks

"It is self-evident that the existence of actual consumer confusion indicates a

likelihood of consumer confusion."  *Virgin Enters. Ltd. v. Nawas*, 335 F.3d 141, 151 (2d Cir.

2003).  It is well established, however, that a plaintiff seeking to prevail under the Lanham Act

need not prove the existence of actual confusion, "since actual confusion is very difficult to

prove and the Act requires only a likelihood of confusion."  *Lois Sportswear*, 799 F.2d at 875.

Although plaintiffs typically use surveys to demonstrate the existence of

consumer confusion, the Court has already indicated that based on the information furnished,

23

Plaintiff's survey is so badly flawed that it is inadmissible for trial purposes and thus irrelevant in determining whether Defendant is entitled to judgment as a matter of law.  The only other "evidence" of actual confusion offered by Plaintiff is the testimony and affidavit of Pacifico, Plaintiff's President.  Pacifico alleged that a credit report naming Defendant caused confusion among "people" who mistook Defendant for Plaintiff.  (Pacifico Dep. at 81-90.)  He also claimed that he received telephone calls from unidentified individuals commenting on Plaintiff's new trucks which were in actuality trucks belonging to Defendant.  (Aff. of Pacifico, dated Sept. 15, 2004, ¶ 9.)  Given Plaintiff's failure to elicit *any* admissible evidence in support of its claims, i.e., testimony by these alleged individuals and/or some proof that they were prospective customers, Plaintiff's wholly speculative testimony must be discounted.  *See W.W.W. Pharmaceutical*, 984 F.2d at 574-75.  Accordingly, the absence of proof of any actual confusion, although not dispositive, is a factor favoring Defendant.  *See Windsor, Inc.*, 799 F. Supp. at 1524 ("Although no evidence of actual confusion is necessary to prove a likelihood of confusion, the court may infer from the lack of such evidence that consumer confusion is unlikely to occur.").

### 6.    *Defendant's Intent in Adopting its Mark*

This factor examines whether defendant "adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between [defendant's] and [plaintiff's] product." *Lang*, 949 F.2d at 583; *see also Streetwise Maps*, 159 F.3d at 745.  In the instant case, Plaintiff argues that the Court may infer Defendant's bad faith based on the fact that Defendant asked Plaintiff for its consent to register the VISTAR mark.  Prior knowledge of Plaintiff's mark, however, without more, does not create an inference of bad faith.  *See Playtex Prods., Inc.*, 390 F.3d at 166; *see also Lang*, 949 F.2d at 584 ("[A]doption of a trademark with

actual knowledge of another's prior registration of a very similar mark may be consistent with good faith.").

Plaintiff further contends that after learning of Plaintiff's objections, Defendant did not "make any major modification" but rather "merely stylized the first letter of its name, while retaining the same general configuration of the name and star design."  (Pl.'s Mem. at 9.)  "Good faith can be found if a defendant has selected a mark which reflects the product's characteristics, has requested a trademark search or has relied on the advice of counsel." *W.W.W. Pharmaceutical Co.*, 984 F.3d at 575; *see also Lang*, 949 F.2d at 583.  Here, Defendant conducted an extensive trademark search and relied on the opinion of its counsel, an attorney with more than 20 years experience in intellectual property law.  In addition, after learning of Plaintiff's mark and after receiving Plaintiff's objections to its proposals, Defendant abandoned the term "Vista" and  ultimately adopted "VISTAR/VSA."  Because Plaintiff has not presented any evidence that Defendant intended to promote confusion between the companies or appropriate Plaintiff's goodwill, the Court finds that Plaintiff has failed to raise triable issue of fact as to Defendant's alleged bad faith. *See Streetwise Maps*, 159 F.3d at 746-47 (approving lower court's finding that defendant acted in good faith in adopting "StreetSmart" trademark despite defendant's knowledge that plaintiff marketed its maps under name "Streetwise" and despite defendant's failure to perform official trademark search where defendant "did not copy an identical trademark . . . but rather concocted a different name by combining a descriptive word, 'street'–commonly used in map products–with another word they had used in previous products, 'smart,' to indicate what the user would become if he purchased the product"); *W.W.W. Pharmaceutical*, 984 F.3d at 575 (finding Plaintiff did not demonstrate bad faith where it

presented no evidence thereof and defendant, which had knowledge of plaintiff's mark, performed trademark search and relied on counsel's advice).

### 7.      The Quality of Defendant's Product

"'This factor is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 965 (2d Cir. 1996) (quoting *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 398 (2d Cir. 1995)).  Plaintiff has submitted no evidence suggesting that the quality of Defendant's products are inferior to those of Plaintiff and makes no argument regarding quality in its memorandum of law.  Thus, because Plaintiff has made no effort to elicit facts which might show that there is a genuine issue of material fact as to the quality of Defendant's product, this factor favors Defendant.

### 8.      The Sophistication of the Relevant Consumer Group

"Because likelihood of confusion 'must be assessed by examining the level of sophistication of the relevant purchasers' of the plaintiff's and defendant's services, 'we must consider [t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods.'" *Id.* (quoting *W.W.W. Pharmaceutical,* 984 F.2d at 575).  Generally, purchasers of small, unsophisticated items are considered casual buyers prone to impulse buying, *see W.W.W. Pharmaceutical,* 984 F.2d at 575-76, while purchasers of more expensive items tend to be more careful, *see Arrow Fastener Co.*, 59 F.3d at 399.  However, "while price differences are important in determining the sophistication of customers, they are not dispositive."  *Id.*

Here, it is undisputed that Defendant's customers are generally fairly

sophisticated.  Further, Plaintiff's President testified that the level of sophistication of his customers varies but that he has a number of fairly sophisticated customers.  Given the nature of the parties' businesses and the general sophistication of their customers, the Court finds that this factor favors Defendant.

> **C.**     ***Balancing the Factors***

Having carefully considered and weighed the eight *Polaroid* factors as well as the arguments and submissions of the parties, the Court determines as a matter of law that Plaintiff has failed to offer evidence that creates a material question of fact as to the likelihood of consumer confusion with respect to the parties' trademarks.  Accordingly, Defendant's motion for summary judgment is granted.

## CONCLUSION

For all of the above reasons, Defendant's motion for summary judgment is GRANTED as to all of Plaintiff's claims, and this case is accordingly DISMISSED in its entirety.  The Clerk of Court is directed to CLOSE this case.

**SO ORDERED.**

Dated: September 27, 2005
      Central Islip, New York              /s_____
                                        Denis R. Hurley,
                                        United States District Judge